# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

TODD HILKER,                          :

          Plaintiff,          :
                                Case No. 3:09CV0186

  vs.                               :

                                District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                    :     Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,          :

          Defendant.          :

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Todd Hilker sought financial assistance from the Social Security

Administration ["SSA"] by applying for Disability Insurance Benefits ["DIB"] in

June 2001, alleging disability since October 2, 1999. (Tr. 66-68). He described his

disabling conditions as "can't sleep, can't wake up, nightmares, fatigue, stress,

anxiety, depression, cannot deal with people, cannot concentrate on a task." (Tr.

78).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

1

After various administrative proceedings, including a remand from the Appeals Council, Administrative Law Judge ["ALJ"] Melvin A. Padilla denied Plaintiff's DIB application based on the ALJ's conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 31). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. # 14), the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits, or at a minimum, remand of this case to the SSA to correct certain claimed errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was 38 years old at the time of the administrative decision, and thus was considered to be a "younger individual" for purposes of resolving his DIB claim. *See* 20 C.F.R. § 404.1563(c); (*see also* Tr. 29). He has a high school education. *See* 20 C.F.R. § 404.1564(b)(4); (*see also* Tr. 84). He served in the United

States Army from 1989 to 1992. (Tr. 71, 499). Plaintiff has worked in the past primarily as a truck driver and electronic equipment repairer. (Tr. 97-104).

Plaintiff testified at the administrative hearing that he was treated by Dr. Walters at the mental health clinic of the Veterans Administration Medical Center ["VAMC"]. (Tr. 699-700). He said that he took his medication as prescribed. (*Id.*). He lived alone at that time, and became nervous around other people. (Tr. 700). He took 45-minute walks every morning. (Tr. 701). He maintained a very structured lifestyle, buying his week's groceries on Monday, doing his laundry on Saturday, and cleaning his apartment every Sunday. (Tr. 714-15). Plaintiff testified that he had difficulty deviating from his routine. (Tr. 711). He prepared food in a microwave and used disposable dishes. (Tr. 706). He swept, mopped, vacuumed, made the bed, and used a computer at home. (Tr. 706-07). He read self-help and science fiction books. (*Id.*). He spoke to his mother by telephone four to five times a day (Tr. 710), and drove to Indiana to visit his parents once a month. (Tr. 713). Plaintiff met friends at the mall, but all were in their 60s or 70s. (Tr. 709).

The parties have provided detailed and informative descriptions of Plaintiff's medical records supported with many specific citations to evidence of record. Because there is no need to expand upon the parties' well-written factual

descriptions, the recitation of facts in this Report and Recommendation is limited to a summary of the relevant medical opinions.

South Community, Inc. Plaintiff presented to the behavioral healthcare center in April 1999 with complaints including "nervousness, anxiety, [and] restlessness/sleeping problems" that reportedly had bothered him for at least four years. (Tr. 579, 567). Plaintiff related a history of strained relationships and inability to maintain employment. (Tr. 567). Although he attributed his symptoms to chemical exposure while serving in the Gulf War, a letter purportedly from Plaintiff's parents stated that his symptoms of anxiety and depression pre-dated his Gulf War experience. (*Id.*). An intake consultant remarked that Plaintiff "may have [a] significant thought disorder" and posited "early onset of schizophrenia" as a possible cause. (Tr. 566). Plaintiff was placed on medications including Risperdal (*see* Tr. 581), and continued to be seen there through November 1999, when he had returned to work as a truck driver and stopped appearing for treatment. (*See* Tr. 551-81). Although one notation referred to ruling out "schizoaffective disorder" (Tr. 556), the records produced from this facility provide no further insight into that proposed diagnosis.

Charles L. Walters, M.D. Dr. Walters is Plaintiff's treating psychiatrist at the VAMC. In April 2000, after being asked to leave his parents' home, Plaintiff

was admitted to the VA domiciliary for a psycho-social rehabilitation program. (Tr. 300-01). When first assessed by Dr. Walters, Plaintiff's affect was anxious and his mood congruent. (Tr. 296). Plaintiff reported difficulty sleeping. (*Id.*). Dr. Walters noted that Plaintiff seemed confused about the program. (*Id.*). Dr. Walters prescribed Celexa and referred Plaintiff to a counselor. (*Id.*). Plaintiff remained in the live-in program, participating in group and individual counseling, until he received an "irregular discharge" on June 30, 2000, due to testing positive for alcohol use. (*See* Tr. 247-301).

The record shows that Dr. Walters continued to treat Plaintiff at the VAMC about every three months through at least February 2007. (Tr. 183-84, 187-200, 206-08, 312-22, 383-84, 386, 392, 397, 402-05, 409-10, 524, 532, 545-46, 582-86, 592-93, 613-17, 624). Plaintiff was maintained on successive psychotrophic medications, including Celexa, Risperdal and Geodon. (Tr. 505-06). On October 21, 2001, a mental status examination showed that Plaintiff had vague suicidal ideation. (Tr. 216). In August 2002, after moving into his own apartment, Plaintiff reported more social anxiety and fear of leaving that space. (Tr. 403-05). By October 2002, Plaintiff's mood was described as depressed and his affect was constricted. (Tr. 397). In January 2003, his affect was anxious. (Tr. 392). In

October 2003, Dr. Walters reported that Plaintiff's affect was broad and his mood euthymic. (Tr. 383).

In April 2004, Plaintiff was admitted for 72-hour psychiatric observation after he got into a fight and police were called. (Tr. 509-17, 523-49, 613-14). He reported some homicidal ideation. (*Id.*). On admission, his mood was confused and his recent and remote memory impaired. (Tr. 544). Dr. Walters rated his Global Assessment of Functioning ["GAF"] at 39 on admission (Tr. 531) and at 55 upon discharge. (Tr. 613).

Progress notes from April and May 2004 report that Plaintiff's father confirmed that Plaintiff had been off his medication, Risperdal, since January, and had been aggressive and agitated, with "rapid mood swings." (Tr. 506, 520-21). Dr. Walters restarted Risperdal. (Tr. 506).

In June 2004, Plaintiff underwent a post traumatic stress disorder ["PTSD"] assessment. (Tr. 494-97). The test results were considered most consistent with a schizoaffective disorder, together with anxiety and a history of substance abuse. (Tr. 496). In July 2005, Plaintiff wanted to discontinue his medication, but Dr. Walters advised against it. (Tr. 592). In November 2005, when Plaintiff asked Dr. Walters to change his medication due to a 50-pound weight gain, Dr. Walter allowed Plaintiff to taper off Risperdal and placed him on Geodon. (Tr. 585-86).

In February 2007, Dr. Walters prepared a report based on treating Plaintiff for 6 years, since 2001. (Tr. 664-68). During this period, Plaintiff had experienced psychotic symptoms, including hearing negative voices and seeing bugs. (Tr. 664). During his most recent appointment on February 3, 2007, Plaintiff presented with a dysthymic mood, but had an appropriate affect. (Tr. 666). His concentration and recall were acceptable, and he displayed no evidence of a thought disorder. (*Id.*). Plaintiff was attending a community college, studying to be a radiology technician, and was doing quite well. (Tr. 664). He described six previous suicide attempts, five by overdose and one by putting a bag over his head. (Tr. 666). He was able to warm up TV dinners in a microwave, run a vacuum cleaner and do laundry. (Tr. 665). Plaintiff took Geodon for his schizoaffective disorder/bipolar type, responding well to the medication, with no side effects. (*Id.*). Plaintiff reported occasional audible hallucinations, which were more positive now, and no visual hallucinations. (Tr. 666). Dr. Walters diagnosed Plaintiff with schizoaffective disorder/bipolar type and polysubstance dependence in sustained full remission, and assigned a GAF of 45. (Tr. 667). Dr. Walters opined that Plaintiff was disabled between October 1, 1999 and December 31, 2004, by a severe psychotic disorder, later diagnosed as a schizoaffective disorder. (*Id.*).

At the same time, Dr. Walters completed interrogatories wherein he opined that Plaintiff could not sustain the mental demands of work.  (Tr. 669-77).

Joan P. Williams, Ph.D.  In November 2001, Dr. Williams, a state agency reviewing psychologist, reported that Plaintiff could understand, remember and carry out simple one- to two-step tasks and had adequate attention for simple, routine work.  (Tr. 176).  Dr. Williams noted that Plaintiff would do best in an environment that did not require public contact or more than minimal interaction with coworkers.  (*Id.*).  Dr. Williams also opined that Plaintiff would have the ability to adapt to routine workplace changes.  (*Id.*; *see* Tr. 161-77).

Craig D. Olson, Psy.D.  Dr. Olson performed a psychological examination of Plaintiff in July 2007, on behalf of the state agency.  (Tr. 678-87).  On mental status examination, Plaintiff's speech was somewhat reduced in volume and pressured in rate, while affect was appropriate to labile.  (Tr. 680).  Although Dr. Olson thought that Plaintiff's mood "seemed hypomanic or edgy," Plaintiff reported that his mood was "upbeat" due to his daily ritual. (*Id.*).  Despite Plaintiff's claim that he no longer had problems with anxiety, Dr. Olson observed "a number of autonomic signs of anxiety . . . during the clinical interview" – *i.e.*, "the claimant rapidly tapped his foot, maintained a very tense body posture, had trembling hands and body, nervous laughter, and clammy hands upon

handshake." (Tr. 680-81). Dr. Olson also reported that Plaintiff was "hypervigilant" during the interview, and "may experience some paranoia and grandiosity." (Tr. 681). Dr. Olson stated that Plaintiff might lack insight into stress intolerance and difficulty with anxiety since autonomic signs of anxiety belied his statement that anxiety was no longer a problem. (Tr. 682).

Given Plaintiff's mood symptoms, delusional thinking and hallucinations, Dr. Olson diagnosed Plaintiff with schizoaffective disorder, bipolar type, and assigned Plaintiff a GAF of 49. (*Id.*). Dr. Olson opined that Plaintiff was "at least moderately impaired" in his ability to interact with co-workers and supervisors, due to anxiety symptoms, auditory hallucinations and occasional thinking problems. (Tr. 683). Plaintiff also was mildly impaired in maintaining attention, concentration, persistence and pace. (*Id.*). Dr. Olson concluded that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity in a competitive job environment on a consistent basis was severely impaired. (*Id.*).

Dr. Olson also completed a Medical Source Statement finding Plaintiff markedly limited in relating to co-workers and supervisors, and markedly to extremely limited in adapting to change in a work setting. (Tr. 685). Dr. Olson felt that Plaintiff would decompensate under the stress of day-to-day

employment and could not do even simple repetitive tasks on a sustained basis. (*See* Tr. 684-87).

Medical Expert Testimony  Based on her review of the records, Dr. Mary Eileen Buban, a clinical psychologist, testified that Plaintiff had developed a "significant" schizoaffective disorder, and continued to experience some hallucinations and delusions, even with medications.  (Tr. 726-27).  She also opined that Plaintiff met Listing12.03.  (Tr. 727).  As to the "A" criteria, Dr. Buban noted that Plaintiff had delusions or hallucinations and emotional withdrawal and isolation.  (Tr. 727).  Under the "B" criteria, Dr. Buban remarked on Plaintiff's marked limitations in social functioning and in concentration, persistence and pace.  (*Id*.).  Dr. Buban also testified that Plaintiff had experienced at least two or three episodes of decompensation.  (Tr. 727-28).

"[B]ut I think where he actually meets the listing, sir, is C part 2, a residual disease process that has resulted in such marginal adjustment, and even minimal increase in mental demands or changing the environment would be predicted to cause the individual to [decompensate]."  (Tr. 728).  Dr. Buban felt that Plaintiff's compliance with medication and his routine allowed him to keep up "a very insulated functioning" in the community (*id*.), and his "very rigid lifestyle" helped him to maintain his activities.  (Tr. 729).  Plaintiff was able to concentrate

as to specific types of information, and higher, complex tasks did not offer him any difficulties, but Dr. Buban felt that Plaintiff would have difficulty with routine, mundane tasks. (*Id.*).  When questioned by the ALJ about how Plaintiff received good grades in school and read books, Dr. Buban responded that mental illness does not correlate to intellectual acuity. (Tr. 728-30).

Dr. Buban also testified that the issue of substance abuse apparently "was confounding everything" when Plaintiff's difficulties emerged in 1998 and 1999. (Tr. 730).  His original diagnosis was depression and PTSD, with the diagnosis of schizoaffective disorder/bipolar type delayed until May 2004. (Tr. 730-31).  Dr. Buban testified that Plaintiff might have met the listing as far back as 1999, had the focus then not been on "rule outs."  (Tr. 732).  "[C]onfounding variables" included Plaintiff's assigned GAF of 60 at that time, along with inconsistencies regarding severity, causal or contributing factors, and the duration of those factors.  (Tr. 732-33).  Accordingly to Dr. Buban, the correct diagnosis "definitely" was made by 2004.  (Tr. 432).  Because Plaintiff's illness is "a progressive disorder," Dr. Buban believed that it had been "progressing for a long time," and she "d[id] not have any problem" with the notion that Plaintiff met the listing criteria in "December 2003."[2] (Tr. 733-34).  She testified that it was "reasonable"

_____

[2]It is important to note that December 2003 was <u>not</u> a date chosen by Dr. Buban to signify the onset of Plaintiff's disability, but rather was suggested (apparently erroneously) by

to assume "that he would not have been able to work full time" as of the time

that he abandoned a truck on the road in 1999.  (Tr. 734-35).

## III.    THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

### A.    <u>Applicable Standards</u>

The Social Security Administration provides DIB to individuals who are

under a "disability," among other eligibility requirements.  *Bowen v. City of New*

*York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" –

as defined by the Social Security Act – has specialized meaning of limited scope.

It encompasses only those who suffer from a medically determinable physical or

mental impairment severe enough to prevent them from engaging in substantial

gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A

DIB  applicant bears the ultimate burden of establishing that he or she is under a

"disability."  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see also Wyatt v.*

*Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992), *Hephner v.*

*Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

---

Plaintiff's counsel as being Plaintiff's "date last insured."  (*See* Tr. 733).  Although the ALJ later found (and Plaintiff apparently agrees (*see* Doc. #9 at 12)) that Plaintiff's last date insured actually was September 30, 2003 (*see* Tr. 24), that discrepancy in essence is irrelevant to the inquiry, given Dr. Buban's subsequent testimony that Plaintiff likely "would not have been able to work full time" as of 1999.  (*See* Tr. 734-35).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 17-18); *see also* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.    The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the insured status requirements of the Act through September 30, 2003. (Tr. 24). The

ALJ also found that Plaintiff had not engaged in substantial gainful activity since October 2, 1999, the alleged onset date. (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of neurotic depression; PTSD; a history of substance abuse in reported remission; and a diagnosis of schizoaffective disorder since May 2004. (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (*Id.*).

At Step 4, the ALJ found that Plaintiff retains the residual functional capacity ["RFC"] to perform work at any level of exertion, but was limited to: 1) low stress jobs; 2) no dealing with the public and minimal and casual contact with supervisors and coworkers; 3) no jobs involving teamwork; 4) no fast-paced work or production quotas; and 5) no extended periods of concentration on a single task. (Tr. 27). The ALJ further found that Plaintiff is not capable of performing his past relevant work. (Tr. 29). Nevertheless, the ALJ found that Plaintiff can perform jobs that exist in significant numbers in the national economy. (Tr. 30). This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB. (Tr. 31).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla . . . but less than a preponderance."  *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Soc. Sec.*, 582

F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by

substantial evidence, 'a decision of the Commissioner will not be upheld where

the SSA fails to follow its own regulations and where that error prejudices a

claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*,

582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, & citing *Wilson v. Comm'r.*

*of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     DISCUSSION

### A.     The Parties' Contentions

Plaintiff claims that the ALJ erred at Step 3 of his sequential evaluation by

not finding that Plaintiff satisfied the criteria for schizoaffective disorder as set

forth in Listing 12.03 during the time that he remained insured. (Doc. #9).

Advancing Dr. Buban's hearing testimony that "Mr. Hilker had a progressive

psychiatric disorder that certainly met the Listing 12.03 in 2004 and likely as early

as 1999" (*id.* at 12, citing Tr. 726-35), Plaintiff contends that the ALJ erred by

substituting his own opinion for that of the medical expert. (*Id.* at 14-17).

Plaintiff also argues that pursuant to Social Security Ruling ["SSR"] 83-20, the

ALJ should have acknowledged the need to infer an onset date in this case. (*Id.* at

15). Plaintiff further contends that Dr. Buban's opinion is supported by the

opinions of Dr. Olson, the examining psychologist, and Dr. Walters, Plaintiff's

treating psychiatrist. (*Id*. at 17).

The Commissioner contends that substantial evidence supports the ALJ's

decision that Plaintiff was not disabled through September 30, 2003, because he

could perform a significant number of jobs. (Doc. #13 at 9). According to the

Commissioner, Plaintiff did not meet all the elements of Listing 12.03 because he

does not satisfy the diagnostic description of the mental disorder contained in the

introductory paragraph. (*Id.* at 10-11).

**B.**     **The Listing and the ALJ's Findings**

Plaintiff bore the burden at Step 3 to show that his impairments met or

equaled the criteria of a specific Listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530-

31 (1990). The United States Court of Appeals for the Sixth Circuit explains:

> At step three, the SSA [Social Security Administration]
> examines the severity of claimants' impairments but
> with a view not solely to their duration but also to the
> degree of affliction imposed . . . Claimants are
> conclusively presumed to be disabled if they suffer from
> an infirmity that appears on the SSA's special list of
> impairments, or that is at least equal in severity to those
> listed . . . The list identifies and defines impairments
> that are of sufficient severity as to prevent any gainful
> activity . . . A person with such an impairment or an
> equivalent, consequently, necessarily satisfies the
> statutory definition of disability. For such claimants,
> the process ends at step three.

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006) (citing, in

part, *Sullivan*, 493 U.S. 532) (other citations omitted).

The Listing at issue in the present case – Listing 12.03, for "*Schizophrenic,*

*Paranoid and Other Psychotic Disorders*" – requires Plaintiff to present evidence to

establish that he meets or equals the following criteria:

> A.     Medically documented persistence, either continuous or
>        intermittent, of one or more of the following:
>        1. Delusions or hallucinations; or
>        2. Catatonic or other grossly disorganized behavior; or
>        3. Incoherence, loosening of associations, illogical
>        thinking, or poverty of content of speech if associated
>        with one of the following:
>                 a. Blunt affect; or
>                 b. Flat affect; or
>                 c. Inappropriate affect;
> or
>        4. Emotional withdrawal and/or isolation;
> AND
>
> B.     Resulting in at least two of the following:
>        1. Marked restriction of activities of daily living; or
>        2. Marked difficulties in maintaining social functioning;
>        or
>        3. Marked difficulties in maintaining concentration,
>        persistence, or pace; or
>        4. Repeated episodes of decompensation, each of
>        extended duration;
> OR
>
> C.     Medically documented history of a chronic schizophrenic,
>        paranoid, or other psychotic disorder of at least 2 years'
>        duration that has caused more than a minimal limitation of
>        ability to do basic work activities, with symptoms or signs

currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.03, Appendix 1 to Subpart P, Part 404.

The ALJ found that as to the period on or before September 30, 2003, the date last insured, Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.03, 12.04, or 12.08. (Tr. 25). The ALJ concluded that, during the insured period, Plaintiff had only moderate difficulties in social functioning and mild difficulties in activities of daily living and in concentration, persistence and pace. (*Id.*). The ALJ did note that Plaintiff had experienced one or two episodes of decompensation. (Tr. 26). With respect to the "C" criteria, however, the ALJ felt that no credible evidence prior to the date last insured indicated that Plaintiff would have decompensated if the mental demands on him or his environment changed. (*Id.*).

C.    **Analysis**

Plaintiff's challenge to the ALJ's decision focuses primarily on the ALJ's handling of the testimony of medical expert Dr. Buban. Observing that the criteria of Section 12.03 rarely are met, Dr. Buban nonetheless felt that Plaintiff met Section 12.03(C)(2), "a residual disease process that has resulted in such marginal adjustment" that "even minimal increase in mental demands or changing the environment" likely would cause Plaintiff to decompensate. (Tr. 727-28). Although she noted that Plaintiff's schizoaffective disorder was not "really clearly diagnosed until May of 2004" (Tr. 730), she also conceded that "it's possible" that Plaintiff met the Listing as early as 1999. (Tr. 732). She noted that "his difficulties became apparent in '98 and '99" (Tr. 730), and that the problems that led to his admission to the VAMC domiciliary program in 2001 "could have been symptoms of this disorder." (Tr. 733). Indeed, "there may have been symptoms through high school." (*Id.*).

Asked on cross-examination by Plaintiff's attorney to be more specific as to when Plaintiff became <u>disabled</u> by his condition, Dr. Buban elaborated as follows:

> [D]o I think all of a sudden in 2004 when they did the psych test he was suddenly impaired? No. This is a progressive disorder. It was progressing for a long

> time.  I don't have a problem with December 2003 in
> terms of, you know, meeting the criteria.[3]

(Tr. 734).  Pressed further, Dr. Buban opined that "[i]t's reasonable" to conclude

that Plaintiff "would not have been able to work full time" as of 1999, when he

quit his job as a professional truck driver by abandoning the truck that he was

driving at that time.  (Tr. 735).

In declining to find that Plaintiff met the listing criteria under Section 12.03

while insured, the ALJ acknowledged Dr. Buban's expert opinion "that the

claimant ha[d] developed a psychotic (schizophrenic) disorder of listing level

severity by May 2004."  (Tr. 26) (parenthetical in original).  He nonetheless

discounted her cross-examination testimony "that it was possible that the

claimant's psychotic illness had been present in 1999" or earlier, stating that such

testimony was "not corroborated by clinical testing or any longitudinal medical

history."  (*Id*.).  He cited Dr. Buban's own testimony as indicating "that the

diagnosis of a psychotic condition was not 'accurately' made until May 2004,"

after Plaintiff's last date insured.  (*Id*.).  He also concluded that "[t]here is no

credible evidence" that Plaintiff "would have decompensated if the mental

demands on him or his environment changed."  (*Id*.).

---

[3]*See* n.2, *supra.*

Continuing to critique Dr. Buban's opinion, ALJ Padilla remarked on what he termed her "admi[ssion]" that substance abuse and poor compliance with treatment were "confounding variables" that "made it difficult to evaluate the claimant's mental health status prior to May 2004." (Tr. 27). He concluded that Dr. Buban's testimony on cross-examination "was weak, speculative, and clearly inconsistent with her earlier testimony" that the Section 12.03 criteria were not documented until May 2004. (*Id.*).

The ALJ's evaluation of Dr. Buban's opinions as aforesaid failed to adhere to the legal criteria mandated by applicable law. An ALJ may not ignore evidence favorable to the Plaintiff. Rather, he "must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)). Although the Regulations generally give more weight to the opinions of examining medical sources than to the opinions of non-examining medical sources, *see* 20 C.F.R. § 404.1527(d)(1), the opinions of non-examining medical experts or state agency medical consultants still have potential probative value. Accordingly, ALJs must evaluate the opinions of non-examining medical experts under numerous factors described in the Regulations,

including "supportability," "consistency," and "specialization." *See* 20 C.F.R. §§ 404.1572(d), (f).

Speaking through the Rulings – which "are binding on all components of the Social Security Administration," 20 C.F.R. § 402.35(b)(1) – the Commissioner emphasizes:

> [T]he opinions of State agency medical . . . consultants . . . and other program physicians . . . can be given weight only insofar as they are supported by substantial evidence including any evidence in the case record, considering such factors as the supportability of the opinion . . ., the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical . . . consultant . . . or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

Social Security Ruling 96-6p, 1996 WL 374180, at *3 (July 2, 1996).

A review of the administrative decision reveals that, in discussing Dr. Buban's opinion, ALJ Padilla made no mention of her specialization as a clinical psychologist, nor did he acknowledge her opinion's consistency with other record evidence – including, for example, the opinions of treating psychiatrist Dr. Walters and state agency examining physician Dr. Olson. Dr. Walters opined in 2007 that Plaintiff suffered from a psychotic disorder, eventually identified as a

23

schizoaffective disorder, dating back to 1999. (*See* Tr. 667). Dr. Walters further

opined that Plaintiff could not perform any work-related mental task. (Tr. 669-

77). While post-insured status evidence of a claimant's condition generally is not

relevant, *see Bagby v. Harris,* 650 F.2d 836 (6th Cir. 1981); *Bogle v. Sec'y of Health &*

*Human Servs.,* 998 F.2d 342 (6th Cir. 1993), such evidence will be considered if it

establishes that an impairment existed continuously and in the same degree from

the date the insured status expired. *Johnson v. Sec'y of Health & Human Servs.,* 679

F.2d 605 (6th Cir. 1982). Dr. Walters' opinion tends to establish precisely that as to

Plaintiff's condition. Dr. Olson, too, concluded in 2007 that Plaintiff's ability to

withstand the stress and pressures associated with day-to-day work activity in a

competitive job environment on a consistent basis was "severely impaired." (Tr.

683). Accordingly, Dr. Buban's opinion was consistent with other medical

evidence of record.

Moreover, contrary to the ALJ's findings, both Dr. Buban's and Dr.

Walters' opinions to that effect were substantiated by other evidence in the

record suggesting that Plaintiff's psychological impairment met Section 12.03

criteria prior to the date last insured of September 30, 2003. For example, when

Plaintiff presented to the VAMC on April 5, 2000, he indicated that he had been

unable to hold a job for the prior two years. (Tr. 247). He had lost three jobs due

to interpersonal relationship problems with his supervisors and/or co-workers. (*Id*.). He was admitted to the VAMC for domiciliary treatment for two months beginning in April 2000. (Tr. 370-71). In October 2001, Plaintiff again was hospitalized after an argument with his mother left him feeling suicidal and homicidal. (Tr. 198). After moving out of his parent's house in August 2002, Plaintiff called the VAMC because he was having more social anxiety and fear of leaving his apartment. (Tr. 403, 405). By October 2002, Plaintiff's mood was depressed and his affect was constricted. (Tr. 397). He continued to be symptomatic when seen by Dr. Walters in 2003. (Tr. 384-92). Plaintiff's father, too, testified as to his son's 15-year history of progressively worsening mental health symptoms (*see* Tr. 716-26), describing Plaintiff's reliance on certain "rituals" and his "strange . . . behavior such as going into the garage in the winter in a paper box with a heater rewriting the dictionary, violent nightmares, smashing walls." (Tr. 719).

The Commissioner suggests that ALJ Padilla's conclusion as to Plaintiff's RFC though September 30, 2003 nonetheless was properly based on the findings of reviewing physician Dr. Williams. (*See* Doc.# 13 at 14). The following excerpt from the ALJ's decision confirms his reliance on Dr. Williams' November 2001 assessment: "The treatment records strongly suggest that [Plaintiff] was

25

relatively stable when he was compl[ia]nt with his medication and did not abuse alcohol, giving every indication that he was fully capable of carrying out at least simple tasks as noted by Dr. Williams." (Tr. 28). Dr. Williams' assessment to that effect, however, conflicts with the overall weight of the evidence. Dr. Buban testified that substance abuse did not appear to have been significant factor affecting Plaintiff's condition after 1999 (Tr. 735) – indeed, under direct questioning by the ALJ, she opined that indications in the record of "occasionally drinking" would not have had "a major impact" (Tr. 732) – and yet Plaintiff's condition thereafter clearly was <u>not</u> stable. Additionally, Dr. Buban expressly opined that whatever "very insulated functioning" (Tr. 728) Plaintiff was able to maintain in his daily living was a product of his "rigid adhere[nce]" (Tr. 727) to "a very rigid lifestyle." (Tr. 729).

The Court does not dispute the ALJ's prerogative to resolve conflicts in the medical evidence. When such conflicts involve the opinions of a treating psychiatrist, a consultative examiner and a medical expert all aligned against that of a non-examining state agency psychologist, however, the ALJ may not resolve such conflicts by ignoring the law of the Sixth Circuit and Social Security regulations requiring deference and greater weight to the opinions of treating and examining physicians. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985);

*Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1983); 20 C.F.R. § 404.1527(d)(2). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

The ALJ erred by drawing his own conclusions from the same medical evidence on which Dr. Buban relied. Case law recognizes that "an ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Additionally, the Sixth Circuit has noted that "[s]tate agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence." *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004). Given the existing record, this Court can only deduce that the ALJ's finding that Plaintiff's work-related abilities were no more than moderately impacted by the severity of Plaintiff's impairments prior to September 30, 2003 (*see* Tr. 28) was based on the ALJ's own interpretation of Plaintiff's capabilities, not on the evidence. The record in this case clearly demonstrates that Plaintiff's condition has worsened progressively over time. Although he was not "officially" diagnosed with schizoaffective disorder until

2004, Plaintiff did display significant psychological symptoms consistent with that condition prior to that date, showing that he met Listing 12.03(C)(2).

Because the ALJ failed to follow the Regulations in analyzing the medical opinions of record and failed to accord any weight to the opinions of the treating psychiatrist, consultative examiner and/or the medical expert in this case, and because his basis for rejecting Dr. Buban's opinion lacks substantial support in the record, the ALJ's RFC finding through September 30, 2003, which relies on the opinions of non-examining state agency physicians, is not supported by substantial evidence. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997).

To the contrary, substantial evidence supports the conclusion that Plaintiff met the listing criteria of Section 12.03(C)(2) prior to the expiration of his insured status on September 30, 2003.

## VI.    JUDICIAL AWARD OF BENEFITS

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under sentence four of 42 U.S.C. § 405(g), this Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without

remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand for payment of benefits is warranted only "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id.*

A judicial award of benefits is warranted in the present case. "[A]ll essential factual issues [relative to the existence of a disability] have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Id.*; *see also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 782 (6th Cir. 1987). Plaintiff here clearly <u>was</u> disabled prior to the expiration of his insured status. The only issue that remains is to infer from the evidence an onset date for Plaintiff's disability. On remand for an award of benefits, the Social Security Administration should be directed to draw such an inference in accordance with Social Security Ruling 83-20.

IT THEREFORE IS **RECOMMENDED** THAT:

1.      The Commissioner's non-disability finding be VACATED;

2. Plaintiff's case be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for payment of DIB consistent with the Social Security Ac and SSR 83-20; and

3. The case be terminated on the docket of this Court.


May 7, 2010                                    <u>  s/Sharon L. Ovington     </u>
                                                Sharon L. Ovington
                                                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).